Jonathan D. Selbin (State Bar No. 170222)
jselbin@lchb.com
Kristen E. Law (State Bar No. 222249)
klaw@lchb.com
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Marnie C. Lambert (CA Bar No. 165019)
DAVID P. MEYER & ASSOCIATES CO., LPA
1320 Dublin Road, Suite 100
Columbus, Ohio 43215
Telephone: (614) 224-6000
Facsimile: (614) 224-6066

Attorneys for Plaintiff and the putative Class

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MITCHELL FREEDMAN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ALIPHCOM and DOES 1-100, inclusive,<br><br>Defendants. | Case No. C 09-00971 CW<br><br>**FIRST AMENDED COMPLAINT**<br><br>**CLASS ACTION**<br><br>**(1) CONSUMER LEGAL REMEDIES ACT;**<br><br>**(2) BUSINESS & PROFESSIONS CODE SECTIONS 17200 & 17500;**<br><br>**(3) FRAUDULENT CONCEALMENT/ NONDISCLOSURE;**<br><br>**(4) BREACH OF EXPRESS WARRANTY;**<br><br>**(5) BREACH OF IMPLIED WARRANTY;**<br><br>**and**<br><br>**(6) UNJUST ENRICHMENT**<br><br>**DEMAND FOR JURY TRIAL** |

1      1.     Based upon information and belief, along with the investigation of his counsel,

2   Plaintiff Mitchell Freedman ("Plaintiff"), individually and on behalf of all others similarly

3   situated, alleges as follows:

4                      **INTRODUCTION**

5      2.     Plaintiff brings this action for actual damages, equitable relief (including

6   restitution, injunctive relief, and disgorgement of profits), civil penalties, punitive damages, and

7   all other available relief on behalf of himself and all similarly-situated individuals nationwide (the

8   "Class") who purchased an AliphCom ("Aliph") Original Jawbone Bluetooth wireless headset

9   ("Jawbone Headset").

10      3.     All of the claims asserted herein arise out of Aliph's misconduct in connection

11   with the design, manufacture, warranting, advertising and sale of the Jawbone Headsets.

12      4.     All of the claims asserted herein relate only to the Jawbone Headsets' hardware.

13      5.     On information and belief, Aliph began designing, manufacturing, warranting,

14   marketing, advertising and selling the Jawbone Headsets to thousands of consumers throughout

15   the United States commencing in or around 2006.

16      6.     The Jawbone Headsets are designed and manufactured with an ear loop used to

17   hold the device on the user's ear during use.  The ear loop is defective in that it is insufficiently

18   robust to serve its intended purpose (collectively, the "Defect").  As a result of the Defect, the ear

19   loop breaks easily during normal use and will no longer function as intended and ultimately

20   renders the device useless well before the end of its expected useful life.

21      7.     Aliph knew, or was severely reckless in not knowing, at or before the time that it

22   sold the first unit, that the Jawbone Headsets contained the Defect and that the Defect would lead

23   to premature failure of the Jawbone Headsets.  Aliph had sole and exclusive possession of this

24   knowledge and information, which is detailed more fully below.

25      8.     At all times, in every place, and in every communication, Aliph concealed from

26   and/or failed to disclose to Plaintiff, the Class, and everyone in the chain of distribution, the

27   Defect in the Jawbone Headsets, and failed to remove the Jawbone Headsets from the

28   marketplace or take adequate remedial action.  Rather, Aliph sold and serviced the Jawbone

Headsets even though it knew, or was reckless in not knowing, that the Jawbone Headsets were defectively designed or manufactured, would prematurely fail and would ultimately result in Plaintiff's and Class members' inability to use their Jawbone Headsets for their intended purpose and during the time in which consumers, including Plaintiff, reasonably expected they would have use of the Jawbone Headsets.

9.     As a consequence of Aliph's knowing concealment of the Defect, Plaintiff and the Class purchased and currently own defective headsets and have incurred actual damages.

**THE PARTIES**

10.     Plaintiff Mitchell Freedman is a resident of Los Angeles County, California.  On or about June 8, 2008, Plaintiff Freedman purchased a new Aliph Jawbone Bluetooth wireless headset for $99.99 plus tax.

11.     Defendant Aliph claims to be a leading developer of mobile audio products that deliver the best user experience in any environment.  The company was founded in 1999 by Alexander Asseily and Hosain Rahman.  In the U.S., Jawbone products are available at Apple stores, Apple.com, Best Buy, AT&T stores and Jawbone.com.  Aliph is headquartered at 150 Executive Park Blvd. #4550, San Francisco, CA 94134.

12.     The true names and capacities, whether individual, corporate, associate, representative or otherwise, of the defendants identified herein as Does 1-100 inclusive are unknown to Plaintiff, who therefore sues these defendants by said fictitious names.  Plaintiff will amend this complaint to allege the true names and capacities of Does 1-100 when they have been ascertained.  Does 1-100 are in some manner legally responsible for the wrongs and injuries alleged in this complaint and all allegations against Aliph are alleged against Does 1-100.

13.     Each of the Defendants acted as the co-conspirator, agent, joint venturer or alter-ego with respect to all acts, violations, and common course of conduct alleged herein, or is otherwise liable.

14.     The acts alleged in this Complaint have been committed by Defendant(s) and were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of the Aliph's businesses.

1

## JURISDICTION AND VENUE

2     15.     This Court has original jurisdiction over this action under the Class Action

3  Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which: (1) there are 100 or

4  more members in the Plaintiff's proposed class; (2) at least some members of the proposed class

5  have a different citizenship from Aliph; and (3) the claims of the proposed class members exceed

6  $5,000,000 in the aggregate.

7     16.     This court has personal jurisdiction over Aliph because Aliph is a corporation

8  headquartered in California and has purposefully availed itself of the privilege of conducting

9  business activities within the State of California by manufacturing, warranting, advertising and

10  selling Jawbone Headsets to Plaintiff and the Class members and, further, generally maintained

11  systematic and continuous business contacts with the State of California.

12     17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial

13  part of the events, misrepresentations and/or omissions giving rise to Plaintiff's claims occurred

14  in the Northern District when Aliph sold, marketed, distributed and/or warranted one or more of

15  the Jawbone Headsets at issue here.

16

## APPLICATION OF CALIFORNIA LAW

17     18.     California law applies to the claims and issues asserted herein.  Plaintiff seeks

18  damages and equitable relief on behalf of himself and all other consumers similarly situated,

19  under the laws of the State of California.

20     19.     California has significant contacts and/or a significant aggregation of contacts to

21  the claims asserted by Plaintiff and all Class members.

22     20.     California has a materially greater interest than any other State in enforcing the

23  rights and remedies granted to consumers under the California laws invoked in this Complaint.

24  These rights and remedies further strong fundamental public policies of the State of California.

25

## FACTUAL ALLEGATIONS

26     21.     Founded in 1999, Aliph has grown into a leading manufacturer of Bluetooth

27  enabled wireless headsets throughout the United States and the world.

28

22.     Jawbone Headsets are targeted to customers who want or require the latest technology and are willing to pay a premium price.  Typical owners of the Jawbone Headsets are consumers that use their cell phones with great frequency and require a hands-free wireless headset system that is functional in varying environments, with varying noise levels.  These consumers are willing to pay a premium for a device that performs these functions.

23.     Aliph operates in an extremely competitive market where, for some companies, being first to put a new wireless headset on the market can affect profitability.  Early release of a popular design can push a manufacturer to the top of the market.  Unfortunately, this rush to market has a downside.  Here, Aliph rushed the Jawbone Headset to market without ensuring that the product was  free from defects and would operate as advertised and marketed to consumers.

24.     Aliph brings its products to the market through the internet, retail stores, and arrangements with cellular service providers who sell Aliph's wireless headsets.  Aliph is the designer, manufacturer, distributor and seller of the defective Jawbone Headsets that are the subject of this litigation.  Re-sellers of Jawbone Headsets are mere conduits between Aliph and the end user.

25.     Aliph began marketing and selling the Jawbone Headsets at issue in this case in approximately 2006.

26.     The Jawbone Headsets fail to perform as reasonable consumers would expect in that the ear loop of the Jawbone Headset breaks off of the device under normal use conditions long before the end of the expected useful life.  When the earloop breaks, the Jawbone Headsets do not and cannot properly attach to the user's ear, leaving the headsets unusable as a hands-free device.

27.     Aliph failed to adequately design, manufacture, and/or perform tests on the Jawbone Headsets to ensure that they were free from the Defect.

28.     Plaintiff purchased a new Aliph Jawbone Headset from a Verizon retail store on or about June 8, 2008.

29.     At all times relevant, Plaintiff has used his Jawbone Headset in a foreseeable manner and in the manner intended.

30.     When Plaintiff purchased his new Jawbone Headset, the accessories included with his purchase were a wall charger, USB cable, three earbuds and four earloops.  After using the device for a few weeks, the first earloop broke, and the Plaintiff replaced it with another that came with his purchase.  Every few weeks another earloop would break, despite the fact that the Plaintiff was very careful with the device.  After the third earloop broke, Plaintiff contacted Aliph customer service to inquire about purchasing additional earloops and the cause of the breakage.  To date, Aliph has not responded to Mr. Freedman's request for assistance.  Soon after his request for assistance the fourth and final earloop broke, leaving his Jawbone Headset unusable for its intended purpose.

31.     Aliph has redesigned the Original Jawbone Headset with a new, sturdier headset. Now that the redesign is on the market, Aliph no longer offers the Original Jawbone Headset earloop replacements for sale. Thus, consumers who own the outdated version of the device are unable to replace a broken earloop with a new one, even at their own cost.

32.     Plaintiff paid $99.99 plus tax for a purportedly high quality, state-of-the-art headset that he reasonably expected would function properly for three years, and instead received a defective headset that functioned for approximately four months.

### The Uniform Defect In The Jawbone Headsets

33.     The primary purpose of a Bluetooth, hands-free device is to allow the user to talk on a cellular phone, via the headset, while maintaining full use of both hands in order to perform other tasks (*e.g.,* driving) safely.  The benefits of hands-free, wireless devices are obvious, particularly in light of state and local laws that require the use of a headset while driving.  The use of integrated Bluetooth technology allows the  Jawbone Headset to be used with a broad range of cell phones—from high-end smartphones to low-end functional models.  Bluetooth technology enables two devices to communicate with each other over low-frequency radio waves in the 2.4GHz range.  No cables or wires are needed, and the only requirement is that both devices be Bluetooth compatible.  Unlike infrared ports, the connected devices do not need to be in direct line of sight, but they do need to be relatively close to each other.

34.     The Jawbone Headset is defective in that the ear loop breaks off and the device will not stay in place on the user's ear in order to use the device in a hands-free mode of operation.

35.     This Defect is common to, and uniform in, the Jawbone Headsets.

36.     This Defect is substantially likely to prevent the Jawbone Headsets from functioning as intended long before the end of their expected useful life.

37.     This Defect renders the Jawbone Headsets unfit for the ordinary purpose for which they were sold to Plaintiff and the other Class members.

38.     This Defect has necessitated, and will continue to necessitate, costly replacements of the ear loops of the Jawbone Headsets.  Indeed, new ear loops are no longer even available for purchase, requiring Plaintiff and Class members to purchase new headsets altogether.

39.     Had Plaintiff and reasonable consumers like him been aware of the Defect, they would not have purchased their Jawbone Headsets or would have paid substantially less for them.

**Aliph's Knowledge Regarding The Defect**

40.     Before it sold the first unit, Aliph knew, or was reckless in not knowing, that the ear loops on the Jawbone Headsets were inadequate and would break prematurely.

41.     Aliph also was made aware of the Defect through numerous consumer complaints. Because of Aliph's failure to resolve the widespread problem of premature breakage, consumers have taken to posting their complaints on the internet.  Excerpts from various websites are included in Paragraph 48, below.

42.     Aliph is and has been aware of the earloop Defect, but has failed to take corrective action.  Instead, Aliph has responded by denying and ignoring consumer complaints.

43.     To this day, Aliph continues to conceal material information from Plaintiff, the Class, and the public about the Defect in the Jawbone Headsets.

**Plaintiff's And Class Members' Expectations and Experiences**

44.     When he purchased his Jawbone Headset, Plaintiff reasonably expected his headset to function properly for at least the length of the warranty period without the need to expend additional money to obtain the expected useful life.

45.    Reasonable consumers expect that Bluetooth headsets, like the Jawbone Headset, will function properly for at least the length of the warranty period, and do not expect that they will come with an inherent defect that results in failure well before that expected lifetime.

46.    Because of the Defect, and as detailed in Paragraphs 28-32 above, Plaintiff's Jawbone Headset failed completely within four months—well before the end of its expected useful life.

47.    As a result of the Defect alleged herein, Plaintiff is unable to use his Jawbone Headset for its intended purpose, did not get what he paid for, and has incurred actual damages.

48.    Plaintiff's experiences are by no means isolated or unique.  Countless essentially identical complaints with respect to these same Jawbone Headsets can be found all over the internet.  The following messages are just a few verbatim excerpts:

> I had to give up my original Jawbone after having to replace the flimsy ear loop too many times. (Aliph sells them in 4-packs, so I am not the only one who finds they break easily in my laptop bag or pocket). I now use the Motorola H12, which doesn't sound as good, but has a much better design for taking it with you. The earloop folds neatly away, and is made of durable flexible plastic, rather than the brittle Jawbone earloop that doesn't fold out of the way. This version of the Jawbone doesn't seem to have fixed that fatal flaw in design. Enough with the "form over function", it's just a headset![1]

> *    *    *

> I gave up on my Jawbone when the all the flimsy ear loop snapped. For the $125 (+tax) I paid for mine you would think they would at least have used a non-brittle metal that did not snap when flexed more the 10 degrees. The manufacture does not even offer a replacement (3rd party only)

> As for comfort mine was never that comfortable as it never sat quite right nor did it ever sit right. (and since the ear loops were so fragile you could not adjust them properly)[2]

> *    *    *

> Given that the makers of the JawBone headsets will not even

---

[1] http://blog.wired.com/gadgets/2008/05/review-jawbones.html
[2] http://blog.wired.com/gadgets/2008/05/review-jawbones.html

answer email to their support address they have lost me as a customer for ever. Any other manufacture would have offered to replace the earhooks for free or the cost of shipping. They do not even respond to email (and the sales droid at the AT&T store only suggested I buy just buy another)…While it is a good device, because they skimped on one part the entire unit is useless and I recommend nobody waste there money. I now use a Nokia BH-200 it works fine.[3]

\*   \*   \*

I have owned the Jawbone headset for about 3 months. I have no complaints about the sound quality. However, I have broken 3 earloops and when I called their support line was told I could purchase replacements on their website for about $10 for a package of 4. I have been careful with the earloops but they are very, very fragile. While this isn't a lot of money this was not a cheap headset to begin with and I have to add this into the total cost of ownership for this device. If I had it to do over again, I would not purchase the headset. There are others out there with comparable sound quality but without a design flaw like this. My recommendation is you DO NOT BUY THE JAWBONE HEADSET.[4]

\*   \*   \*

GARBAGE!!! After only 2 weeks the ear loop broke. The spare ones that they give you are all different sizes, so you can only use one comfortably. I've had mine for a few months and have gone through all of the 4 ear loops that came with it, and am currently shopping for a new unit. Stay away from this one![5]

\*   \*   \*

**Concealment**

49.     Plaintiff is a consumer who purchased a Jawbone Headset.  Absent discovery, Plaintiff is unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Aliph responsible for engineering design and analysis, marketing and advertising, or sales of the Jawbone Headsets.  Aliph necessarily is in possession of all of this information.

---

[3] http://blog.wired.com/gadgets/2008/05/review-jawbones.html
[4] http://www.filthylucre.com/jawbone-bluetooth-headset-review
[5] http://www.newegg.com/Product/Product.aspx?Item=N82E16875998286

50.     Plaintiff's claims arise out of Aliph's concealment of the Defect.  To the extent that Plaintiff's claims arise from Aliph's concealment, there is no one document or communication, and no one interaction, upon which Plaintiff bases his claims.  He alleges that at all relevant times, including specifically at the time he purchased his Jawbone Headset, Aliph knew, or was reckless in not knowing, of the Defect; Aliph was under a duty to disclose the Defect based upon its exclusive knowledge of them, its affirmative representations about them, and its concealment of the Defect; and Aliph never disclosed the Defect to the Plaintiff or anyone at any time or place or in any manner.

51.     Plaintiff makes the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Aliph:

        a.      **Who**:  Aliph concealed the Defect from Plaintiff, the Class, and everyone in the chain of distribution.  Plaintiff is unaware of, and therefore unable to identify, the true names and identities of those particular individuals at Aliph responsible for such decisions.

        b.      **What**:  Aliph knew, or was reckless in not knowing, and concealed the fact that the Jawbone Headset's earloops are defective and prone to premature breakage, resulting in failure of Plaintiff and Class Members to be able to use the Jawbone Headsets as reasonably expected.

        c.      **When**:  Aliph concealed the fact that the Jawbone Headset's earloops are defective and prone to premature breakage at all relevant times, starting no later than 2006, continuing through the time of sale, and on an ongoing basis, and continuing to this day.  Plaintiff is aware of no time at which Aliph disclosed this material information to anyone outside of Aliph.

        d.      **Where**:  Aliph concealed the fact that the Jawbone Headset's earloops are defective and prone to premature breakage in every communication it had with Plaintiff, the Class, and everyone in the chain of distribution.  Plaintiff is aware of no document, communication, or other place in which Aliph disclosed the existence of the Defect to anyone outside of Aliph.  Such information appears in no sales documents, no displays, no advertisements, no warranties, no owner's manual, nor on Aliph's website.

e.   ***How***:  Aliph concealed the fact that the Jawbone Headset's earloops are defective and prone to premature breakage by not disclosing it to Plaintiff, the Class, or anyone in the chain of distribution at any time or place or in any manner, even though Aliph knew about the existence of the Defect and knew that it would be important to a reasonable consumer.

f.   ***Why***:  Aliph concealed the fact that the Jawbone Headset's earloops are defective and prone to premature breakage for the purpose of inducing Plaintiff and Class members to purchase the Jawbone Headsets and at full price, rather than purchasing competitors' headsets or paying less for Jawbone Headsets.  Had Aliph disclosed the truth about the Defect, Plaintiff (and reasonable consumers) would not have bought the Jawbone Headsets, or would have paid much less for them.

## STATUTES OF LIMITATION

52.   **Discovery Rule**  The causes of action alleged herein accrued upon discovery of the defective nature of the Jawbone Headsets.  Because the defect is latent, and Aliph took steps to actively conceal it, among other reasons, Plaintiff and members of the Class did not discover and could not have discovered the Defect through reasonable and diligent investigation.  Moreover, reasonable and diligent investigation into the cause of the failed Headsets did not and could not reveal a factual basis for a cause of action based on Aliph's failure to disclose/concealment of the Defect.

53.   **Concealment Tolling**  Any applicable statutes of limitation have been tolled by Aliph's knowing and active concealment and denial of the facts as alleged herein, which concealment is ongoing.  Plaintiff and the Class have been kept ignorant by Aliph of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.  Plaintiff and members of the Class could not reasonably have discovered the true, latently defective nature of the Jawbone Headsets.

54.   **Estoppel**  Aliph was and is under a continuous duty to disclose to the Plaintiff and the Class the true character, quality, and nature of the Jawbone Headsets.  Aliph knowingly, affirmatively, and actively concealed the true character, quality, and nature of the Jawbone Headsets, which concealment is ongoing.  Plaintiff reasonably relied upon Aliph's knowing,

1    affirmative, and/or active concealment.  Based on the foregoing, Aliph is estopped from relying

2    on any statutes of limitation in defense of this action.

3                            **CLASS ACTION ALLEGATIONS**

4            55.     Plaintiff brings this lawsuit as a class action on behalf of himself and all others

5    similarly situated as members of a proposed plaintiff Class pursuant to Federal Rule of Civil

6    Procedure 23.  This action satisfies the ascertainability, numerosity, commonality, typicality,

7    adequacy, predominance and superiority requirements of those provisions.

8            56.     The Class is defined as:

9                    All persons and entities residing in the United States who
                     purchased, not for resale, one or more Original Jawbone Headsets
10                   between January 1, 2006 and December 31, 2008.

11           57.     Excluded from the Class are (1) Aliph, any entity in which Aliph has a controlling

12   interest, and its legal representatives, officers, directors, employees, assigns and successors;

13   (2) the judge to whom this case is assigned and any member of the judge's immediate family; (3)

14   persons or entities who distribute or resell Jawbone Headsets, and (4) claims for personal injury,

15   wrongful death and/or emotional distress.

16                           **Numerosity & Ascertainability**

17           58.     **Numerosity – Fed. R. Civ. P. 23 (a)(1):** On information and belief, the Class is

18   comprised of thousands of owners of Jawbone Headsets throughout the United States, making

19   joinder impractical.  The Class is composed of an easily ascertainable, self-identifying set of

20   individuals and entities who purchased Jawbone Headsets.  Discovery will reveal which, if any,

21   other Aliph headsets share the same defective design as the Jawbone Headsets, and the Class can

22   be defined to include such models and/or series of models by name at that time.

23           59.     **Typicality – Fed. R. Civ. P. 23(a)(3):** The claims of the representative Plaintiff

24   are typical of the claims of the Class, in that the representative Plaintiff, like all members of the

25   Class, owns a Jawbone Headset that contains the inherent Defect.  The factual bases of Aliph's

26   misconduct are common to all Class members and represent a common thread of misconduct

27   resulting in injury to all members of the Class.

28

60. **Existence and Predominance of Common Issues of Law and Fact – Fed. R. Civ. P.23(a)(2); 23(b)(3):** There are numerous questions of law and fact common to all Class members, and those questions predominate over any questions that may affect only individual Class members. The predominant common questions include the following:

    a.    Whether the Jawbone Headsets contain common design or manufacturing defect;

    b.    Whether the Jawbone Headsets are substantially certain to fail prematurely;

    c.    Whether the Jawbone Headsets are not of merchantable quality;

    d.    Whether the existence of the Defect in the Jawbone Headsets is a material fact reasonable purchasers would have considered in deciding whether to purchase a headset;

    e.    Whether Aliph knew and/or was reckless in not knowing of the Defect in the Jawbone Headsets;

    f.    Whether Aliph concealed from and/or failed to disclose to Plaintiff and the Class the Defect in the Jawbone Headsets;

    g.    Whether Aliph had a duty to Plaintiff and the Class to disclose the Defect in the Jawbone Headsets;

    h.    Whether Aliph's concealment of and/or failure to disclose the Defect induced Plaintiff and the Class to act to their detriment by purchasing defective Jawbone Headsets;

    i.    Whether Aliph represented, through its words and conduct, that the Jawbone Headsets had characteristics, uses or benefits that they did not actually have, in violation of the Consumer Legal Remedies Act ("CLRA");

    j.    Whether Aliph represented, through its words and conduct, that the Jawbone Headsets were of a particular standard, quality or grade when they were of another, in violation of the CLRA;

    k.    Whether Aliph advertised the Jawbone Headsets with the intent not to sell them as advertised, in violation of the CLRA;

l.      Whether Aliph's active concealment of and/or failure to disclose the true nature of the Jawbone Headsets was likely to mislead or deceive, and therefore fraudulent, within the meaning of Bus. & Prof. Code § 17200, *et seq.*;

m.      Whether Aliph's active concealment of and/or failure to disclose the true nature of the Jawbone Headsets is unfair within the meaning of Bus. & Prof. Code § 17200, *et seq.*;

n.      Whether Aliph's warranties, marketing, advertisements and other express representations that the Jawbone Headsets had certain characteristics and/or were of a certain quality or standard violated Bus. & Prof. Code § 17500, *et seq.*;

o.      Whether Aliph should be declared financially responsible for notifying all Class members of the defective Jawbone Headsets and for the costs and expenses of repair and replacement of all such defective components therein;

p.      Whether Plaintiff and the Class are entitled to compensatory damages, and the amount of such damages;

q.      Whether, as a result of Aliph's misconduct, Plaintiff and the Class are entitled to civil penalties and/or punitive damages, and the amount of such damages;

r.      Whether Aliph should be enjoined from engaging in the methods, acts or practices alleged herein; and

s.      Whether Aliph should be ordered to disgorge, for the benefit of the Class, all or part of its ill-gotten profits received from the sale of the defective Jawbone Headsets and replacement components and/or make restitution to Plaintiff and members of the Class.

61.      **Adequacy of Representation – Fed. R. Civ. P. 23(a)(4):** Plaintiff will fairly and adequately represent and protect the interests of the Class.  Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.  Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so.  Neither Plaintiff nor his Counsel have interests adverse to those of the Class.

62.     **Superiority** - Absent class treatment, Plaintiff and members of the Class will continue to suffer harm and damages as a result of Aliph's unlawful and wrongful conduct. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Without a class action, individual Class members would face burdensome litigation expenses, deterring them from bringing suit or adequately protecting their rights. Because of the relatively modest economic value of the individual Class members' claims, few could likely seek their rightful legal recourse.  Absent a class action, Class members would continue to incur harm without remedy, while Aliph would continue to reap the benefits of its misconduct.  The consideration of common questions of fact and law will conserve judicial resources and promote a fair and consistent resolution of these claims.

### FIRST CAUSE OF ACTION
**Violation of the California Consumer Legal Remedies Act,
Civ. Code Section 1750, et seq. (the "CLRA")
(On Behalf of Consumers Only)**

63.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

64.     Defendant Aliph is a "person" as defined by Civil Code § 1761(c).

65.     Plaintiff and many Class members are "consumers" within the meaning of Civil Code § 1761(d).

66.     The Jawbone Headsets are "goods" within the meaning of Civil Code § 1761(a).

67.     Aliph violated the CLRA's proscription against concealment of the characteristics, use, benefit, or quality of goods by actively concealing at all times from Plaintiff, Class members, and everyone in the chain of distribution in all of its broadly disseminated warranties, marketing and advertising, the material fact that the Jawbone Headsets are defective and substantially certain to fail prematurely.  Specifically, Aliph's active concealment of material facts violated (a) § 1770(a)(5)'s proscription against representing that goods have uses or characteristics they do not actually have; (b) § 1770(a)(7)'s proscription against representing that goods are of a particular standard or quality when they are of another; and (c) § 1770(a)(9)'s proscription against advertising goods with the intent not to sell them as advertised.

68.     Under California law, a duty to disclose arises in four circumstances: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts.

69.     Aliph had a duty to disclose material facts regarding the Defects alleged here pursuant to the second, third, and fourth prongs:

a.     Aliph had and has a duty to disclose material facts about the Defect because Aliph had exclusive knowledge of the Defects at the time of sale.  The Defect, while obvious to an expert engineer, is latent and not something that Plaintiff or Class members could, in the exercise of reasonable diligence, have discovered independently prior to purchase.

b.     Aliph had and has a duty to disclose material facts about the Defect because Aliph undertook active steps to conceal them.  Plaintiff is aware of nothing in Aliph's advertising, publicity, or marketing materials that discloses the truth about the Defect, despite ample evidence that Aliph was aware of the problem by virtue of, if nothing else, numerous consumer complaints.  Aliph has at all times denied the existence of any Defect in the Jawbone Headsets.

c.     Aliph had and has a duty to disclose material facts about the Defect because Aliph made partial representations regarding the quality of the Jawbone Headsets, including the earloops. Specifically, in a news release dated December 21, 2006, Aliph  touted the design of the Jawbone Headsets at issue as follows:

> [Aliph has] always led the industry from a technology perspective, now we've integrated that adaptive technology into a Bluetooth headset that is simple, intuitive, and easy to use – the total product experience has been designed around how consumers actually use wearable technology…
>
> Jawbone has a perforated shield that curves to match the outline of the face, while the soft and smooth underside provides a comfortable feel on the skin.  Only 14 grams, Jawbone feels very light on the head and can be worn on either ear.  Earloops in four different sizes and shapes ensure a customized fit and feel while

1      also maximizing stability on the ear.[6]

2          70.     Had Plaintiff and the Class known the true character and quality of the Jawbone

3   Headsets, Plaintiff and Class members would not have purchased (or would have paid less for)

4   them.

5          71.     To this day, Aliph continues to violate the CLRA by concealing the defective

6   nature of the Jawbone Headsets and by failing or refusing to reveal to Class members that the

7   cause of the problems with the Jawbone Headsets is an inherent defect and not a result of

8   improper use or maintenance.

9          72.     Plaintiff, on behalf of himself and for all those similarly situated, demands

10  judgment against Aliph under the CLRA for injunctive relief in the form of restitution and/or

11  proportional disgorgement of funds paid to Aliph to purchase Jawbone Headsets or repair and/or

12  replace parts of the Jawbone Headsets, an injunction requiring Aliph to adequately repair the

13  Defect or replace the Jawbone Headsets free of charge, and an award of attorneys' fees pursuant

14  to Civil Code § 1780(d).  Plaintiff seeks this injunctive relief for Aliph's violations of CLRA

15  §§ 1770(a)(5), (7), and (9).

16         73.     In accordance with section 1782(a) of the CLRA, Civ. Code § 1782(a), on

17  February 26, 2009, Plaintiff's counsel, on behalf of Plaintiff Freedman, served Aliph, by certified

18  mail, return receipt requested, with notice of its alleged violations of CLRA §§ 1770(a)(5), (7),

19  and (9) relating to the Jawbone Headset owned by Freedman.  A true and correct copy of this

20  notice is attached hereto as Exhibit 1.

21         74.     Notwithstanding Plaintiff's demand for correction, repair, replacement or other

22  remedy of the alleged violations of the CLRA, the Defendant has not given, or agreed to give

23  within a reasonable time, an appropriate correction, repair, replacement, or other remedy within

24  30 days after receipt of the notices.  Thus, Plaintiff and Class members are entitled to and hereby

25  do seek to recover actual damages, punitive damages and any other relief which this Court deems

26  proper against the Defendant.

27  _____

28  [6] A true and correct copy of the quoted news release is attached as Ex. 2.

809131.1                              - 17 -

**SECOND CAUSE OF ACTION**
**Violation of California Bus. & Prof. Code Sections 17200 & 17500**
**(the "Unfair Business Practices Act")**

75.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

76.     Business & Professions Code § 17200 prohibits acts of "unfair competition."  As used in this section, "unfair competition" encompasses three distinct types of misconduct: (a) "unlawful…business acts or practices;" (b) "unfair or fraudulent business acts or practices;" and (c) "unfair, deceptive or misleading advertising."

77.     Aliph violated the Unfair Business Practices Act, Business and Professions Code §§ 17200 and 17500, *et seq.,* by engaging in conduct that violated each of the three prongs identified by the statute and outlined in Paragraph 75, above.

78.     Aliph committed an *unlawful* business act or practice in violation of the Unfair Business Practices Act, Business and Professions code § 17200, *et seq.,* when it violated the CLRA as alleged in Paragraphs 63-73, above.

79.     Aliph committed an *unlawful* business act or practice in violation of the Unfair Business Practices Act, Business and Professions code § 17200, *et seq.,* when it violated the common law prohibition against concealment/nondisclosure as alleged in Paragraphs 79-81, below.

80.     Aliph committed *unfair and fraudulent* business acts and practices in violation of the Unfair Business Practices Act, Business and Professions Code §§ 17200 and 17500, *et seq.,* when it concealed and/or failed to disclose the true defective nature of the Jawbone Headsets in its marketing, advertising, and other broadly disseminated representations in a manner likely to deceive the public.

81.     Aliph disseminated *unfair, deceptive, untrue and/or misleading advertising* in violation of the Unfair Business Practices Act, Business & Professions Code §§ 17200 and 17500, *et seq.,* when it concealed and/or failed to disclose the true defective nature of the Jawbone Headsets in its marketing, advertising and other broadly disseminated representations in

1    a manner likely to deceive the public.  Aliph's misleading advertising statements are set forth at

2    Paragraph 69, above.

3         82.    Aliph's deceptive practices were specifically designed to induce Plaintiff and

4    members of the Class to purchase Jawbone Headsets.

5         83.    Aliph's deceptive practices have deceived and/or are likely to deceive Plaintiff and

6    members of the consuming public.

7         84.    As a direct and proximate cause of Aliph's violation of the Unfair Business

8    Practices Act, Plaintiff and the Class have suffered harm in that they own Jawbone Headsets that

9    have prematurely failed, will prematurely fail, or are substantially certain to prematurely fail and

10   have required or will require Plaintiff and the Class to incur costs to repair and replace defective

11   components or defective Jawbone Headsets as a whole.

12        85.    As a direct and proximate result of Aliph's violation of the Business and

13   Professions Code § 17200, *et seq.,* Aliph has been unjustly enriched and should be required to

14   make restitution to Plaintiff and the Class or disgorge its ill-gotten profits pursuant to Business &

15   Professions Code § 17203.

16        86.    Plaintiff, on behalf of himself and for all others similarly situated, demands

17   judgment against Aliph for injunctive relief in the form of restitution, and/or disgorgement of

18   funds paid to Aliph to purchase the Jawbone Headsets or to repair and replace defective

19   components, or injunctive relief in the form of repairing and replacing defective components on

20   Plaintiff's and Class members' Jawbone Headsets, as well as attorneys' fees, costs and interest.

21                        **THIRD CAUSE OF ACTION**
                          **Concealment/Nondisclosure**
22

23        87.    Plaintiff incorporates by reference the allegations contained in the preceding

     paragraphs of this Complaint.
24

25        88.    Aliph knew, or was reckless in not knowing, that the Jawbone Headsets are

26   defective in that they are substantially certain to break well in advance of their expected useful

27   life.

28

1       89.     Aliph concealed from and/or intentionally failed to disclose to Plaintiff, the Class,

2 and all others in the chain of distribution (*e.g.,* concealments and omissions in Aliph's

3 communications with wholesalers, retailers, and others in the chain of distribution that were

4 ultimately passed on to Plaintiff and the Class) the true defective nature of the Jawbone Headsets,

5 which is that the earloops break prematurely under normal use conditions, rendering the Jawbone

6 Headset useless.

7       90.     Under California law, a duty to disclose arises in four circumstances: (1) when the

8 defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive

9 knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a

10 material fact from the plaintiff; and (4) when the defendant makes partial representations but also

11 suppresses some material facts.

12       91.     As pled with specificity in Paragraph 69, above, Aliph had a duty to disclose

13 material facts regarding the Defect alleged here pursuant to the second, third, and fourth prongs.

14       92.     Aliph concealed and/or failed to disclose the problems with the Jawbone Headsets

15 for the purpose of inducing Plaintiff and the Class to act thereon.

16       93.     Plaintiff and the Class justifiably acted or relied upon to their detriment upon the

17 concealed and/or non-disclosed facts as evidenced by their purchase of the Jawbone Headsets

18 and/or replacement parts for them.

19       94.     Had Plaintiff and the Class known of the Defect, they would have behaved

20 differently, in that they would not have purchased (or would have paid less for) their Jawbone

21 Headsets.

22       95.     As a direct and proximate cause of Aliph's misconduct, Plaintiff and Class

23 members have suffered actual damages in that they bought and own Jawbone Headsets that

24 contain an inherent Defect and that have prematurely failed or are substantially certain to

25 prematurely fail, and will be required to incur costs to repair and/or replace the defective

26 components or the Headsets as a whole.

27       96.     Aliph's conduct has been and is wanton and/or reckless and/or shows a reckless

28 indifference to the interests of others.

97.     Aliph has acted with "malice" as that term is defined in Civ. Code § 3294(c)(1) by engaging in conduct that was and is intended by Aliph to cause injury to the Plaintiff and the Class.

98.     Aliph has committed "fraud" as that term is defined in Civ. Code § 3294(c)(3) through its concealment of material facts known to Aliph with the intent to cause injury to the Plaintiff and the Class.

99.     Plaintiff, on behalf of himself and all others similarly situated, demands judgment against Aliph for actual and punitive damages in accordance with Civ. Code § 3294(a) for himself and each member of the Class, plus attorneys' fees for the establishment of a common fund, interest, and costs.

## FOURTH CAUSE OF ACTION
### Breach of Express Warranty

100.     The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by Plaintiff on behalf of himself and the Proposed Class.

101.     Aliph's express written warranty provides Aliph will either to repair or replace any defective Jawbone Headset during the one (1) year limited warranty period so that the product performs substantially in accordance with the accompanying documentation on the date of initial purchase. See Exhibit 3.

102.     Aliph breached its express warranty by failing to repair or replace Jawbone Headsets that failed within the express warranty period.

103.     Aliph received timely notice of the breach of warranty alleged herein.  Plaintiff notified Aliph of his need for replacement earloops on or about  September 2008.  Moreover, Aliph has been put on notice by the Class as a whole by reason of its own knowledge of the limited functionality of the Jawbone Headsets, by warranty claims and other complaints made by Class members, and by virtue of this Complaint, which brings suit on behalf of all Class members.

104.     Aliph has failed to provide to Plaintiff and Class members adequate warranty repair, warranty replacement of a non-defective unit, or a full refund of the purchase price of the Jawbone Headset, as promised in the written warranty class member's received upon purchase.

105.     As a direct and proximate result of Aliph's breach of warranty regarding, Plaintiff and the Class have suffered actual and consequential damages in that they purchased Jawbone Headsets that do not perform as promised, and they incurred or will have to incur additional expense to replace the Jawbone Headsets with alternative devices that function as intended.

106.     Plaintiff, on behalf of himself and all others similarly situated, demands judgment against Aliph for damages, including compensatory, incidental, and consequential damages (excepting damages for personal injuries) for himself and each member of the Class, plus attorneys' fees, interest and costs.

## FIFTH CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability

107.     Plaintiff incorporates the above allegations by reference as if fully set forth herein.

108.     Aliph is a merchant with respect to Jawbone Headsets.  At the time Plaintiff and the Class members purchased their Jawbone Headsets, Defendants impliedly represented and warranted that the Headsets were free of defects, merchantable, fit for their intended purpose and fit for the ordinary purposes for which such goods are used.

109.     Any limitation on the implied warranty of merchantability is unconscionable under the circumstances and is unenforceable since Aliph knew, or was reckless in not knowing, that the Headsets would fail prematurely.

110.     Aliph has brought itself into privity with Plaintiff and the Class members by warranting the Jawbone Headsets directly to end-user consumers and/or through the agency doctrine.

111.     Because the Jawbone Headsets fail prematurely, Plaintiff's and the Class members' Jawbone Headsets do not operate as represented and are not fit for their ordinary purpose of providing reliable hands-free use of a cellular phone to the user.

FIRST AMENDED CLASS ACTION COMPLAINT
NO. C 09-00971 CW

112.     As a result, Plaintiff and the Class members have suffered or will suffer ascertainable loss of money and property as a direct and proximate result of Aliph's  practices.

113.     As alleged in Paragraph 102, above, Plaintiff provided notice to Aliph of the Defect and the breach of the implied warranty of merchantability and requested that Aliph repair the Defect.  In addition, upon information and belief, members of the Class, by virtue of claims for replacement made pursuant to the express warranties, also notified Aliph of the Defect and the breach of the implied warranty of merchantability.  By virtue of the foregoing, Aliph has received notice of the breach of the warranties.

**SIXTH CAUSE OF ACTION**
**Unjust Enrichment**

114.     The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by Plaintiff on behalf of himself and members of the Class.

115.     By its wrongful acts and omissions described herein, including selling the Jawbone Headsets, Aliph has been unjustly enriched at the expense of Plaintiff and the Class.

116.     Separate and apart from whether or not such conduct constitutes common law fraud or a statutory violation, it would be inequitable for Aliph to retain the profits, benefits, and other compensation obtained by it from its wrongful conduct in manufacturing, marketing and selling the Jawbone Headsets.  Plaintiff specifically alleges this claim in the alternative to any contract-based causes of action.

117.     Plaintiff, on behalf of himself and all others similarly situated, demands restitution from Aliph, and an Order of this Court disgorging all profits, benefits, and other compensation obtained by Aliph from its wrongful conduct and awarding attorneys' fees, costs and interests.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff and Class members request that the Court enter an Order or judgment against Aliph including the following:

1.     An Order certifying this action as a Class Action and appointing Plaintiff as Class Representative and his counsel of record jointly as Class Counsel;

2.     Damages in the amount of monies paid for Jawbone Headsets and replacement earloops;

3.     Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

4.     Pre-judgment and post-judgment interest on such monetary relief;

5.     Equitable relief in the form of restitution and/or restitutionary disgorgement of sums received by Aliph as a result of the unfair, unlawful and/or deceptive conduct alleged in herein;

6.     Injunctive relief;

7.     The costs of bringing this suit, including reasonable attorneys' fees; and

8.     All other relief to which Plaintiff and members of the Class may be entitled at law or in equity and which the Court deems proper.

Dated: April 9, 2009                        Respectfully submitted,

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

By:
        Kristen E. Law

Jonathan D. Selbin (State Bar No. 170222)
jselbin@lchb.com
Kristen E. Law (State Bar No. 222249)
klaw@lchb.com
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ADDITIONAL COUNSEL FOR PLAINTIFF

David P. Meyer (Ohio Bar No. 0065205) *pro hac vice* to
be filed
Marnie C. Lambert (CA Bar No. 165019)
DAVID P. MEYER & ASSOCIATES CO., LPA
1320 Dublin Road, Suite 100
Columbus, Ohio 43215
Tel: (614) 224-6000
Fax: (614) 224-6066

FIRST AMENDED CLASS ACTION COMPLAINT
NO. C 09-00971 CW

Exhibit 1

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

ATTORNEYS AT LAW

KRISTEN E. LAW
PARTNER

EMBARCADERO CENTER WEST
275 BATTERY STREET, 30TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3339
TELEPHONE: (415) 956-1000
FACSIMILE: (415) 956-1008
mail@lchb.com
www.lchb.com

NEW YORK
NASHVILLE

February 26, 2009

**VIA CERTIFIED MAIL (RETURN RECEIPT REQUESTED)**

Hosain Rahman
Chief Executive Officer and Co-Founder
99 Rhode Island Street, 3rd Floor
San Francisco, CA 94103

Alexander Asseily
Chairman and Co-Founder
99 Rhode Island Street, 3rd Floor
San Francisco, CA 94103

Agent for Service of Process
CT Corporation System
818 Seventh St.
Los Angeles, CA 90017

Re:   Notice Concerning Deceptive Practice under the California Consumer
      Legal Remedies Act and Demand Letter Re: Aliph Jawbone

Dear Sirs :

      Together with our co-counsel, David P. Meyer & Associates CO., LPA, we
represent Mitchell Freedman.  Pursuant to the California Consumer Legal Remedies Act
("CLRA"), California Civil Code § 1770, *et seq.* (specifically, §§ 1782(a)(1) and (2)), Mr.
Freedman, on behalf of himself and all other similarly situated consumers nationwide
(collectively, the "Class"), through his undersigned counsel, hereby notify you that Aliphcom
("Aliph") is alleged to have violated Civil Code Section 1770 by warranting, marketing,
advertising and selling defective Jawbone Bluetooth Wireless Headsets ("Jawbone Headsets")
while concealing from consumers and the public material information about the defective
headsets.

February 26, 2009
Page 2

Specifically, the Jawbone Headsets at issue are defective in that they are designed and manufactured with an ear loop, used to hold the device on the user's ear during use, that is insufficiently robust and as a result breaks prematurely during normal use, rendering the product useless for its intended purpose. Aliph knew of these defects, and concealed them from consumers and the public in a manner violative of the California Consumer Legal Remedies Act, California Civil Code Section 1770, *et seq.*

Aliph's conduct constituted, among other things, violations of Section 1770 of the California Civil Code as enumerated below. By concealing the defective nature of the ear loops provided with its Jawbone Headsets, Aliph has:

1. Represented that Aliph Jawbone Headsets have characteristics or benefits which they do not have in violation of Section 1770(a)(5);

2. Falsely represented that Aliph Jawbone Headsets are of a particular standard, quality or grade in violation of Section 1770(a)(7); and

3. Advertised the Aliph Jawbone Headsets with the intent not to sell them as advertised in violation of Section 1770(a)(9).

Pursuant to § 1782 of the CLRA, and based on the foregoing, Freedman, on behalf of himself and all others similarly situated (the "Class"), demands that Aliph cease the above-described conduct, and agree to replace the defective Aliph Jawbone Headsets at no cost or otherwise make their purchasers and owners whole. Please be advised that should Aliph refuse this demand, Mr. Freedman will seek monetary damages for himself and a proposed Class of others similarly situated, as well as an award of injunctive relief, restitution, punitive damages, and any other relief a court deems proper.

If you have any questions regarding this notice and demand, feel free to contact me at (415) 956-1000.

Very truly yours,

Kristen E. Law

KEL:mg

802389.1



**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

SAN FRANCISCO CA 94103

OFFICIAL USE

0026

| Postage | $ .42 |
| Certified Fee | 2.70 |
| Return Receipt Fee (Endorsement Required) | 2.20 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ 5.32 |

Postmark Here

02/26/2009

Sent To  Hosain Rahman
Chief Executive Officer and Co-Founder
Street, Apt. No.; or PO Box No. 99 Rhode Island Street, 3rd Floor
City, State San Francisco, CA 94103

7008 3230 0002 3126 2766

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

LOS ANGELES CA 90017

OFFICIAL USE

0026

| Postage | $ .42 |
| Certified Fee | 2.70 |
| Return Receipt Fee (Endorsement Required) | 2.20 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ 5.32 |

Postmark Here

02/26/2009

Sent To  Agent for Service of Process
CT Corporation System
Street, Apt. No.; or PO Box No. 818 Seventh St.
City, State, ZIP+4 Los Angeles, CA 90017

PS Form 3800, August 2006

7008 3230 0002 3126 2780

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

SAN FRANCISCO CA 94103

OFFICIAL USE

0026

| Postage | $ .42 |
| Certified Fee | 2.70 |
| Return Receipt Fee (Endorsement Required) | 2.20 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ 5.32 |

Postmark Here

02/26/2009

Sent To  Alexander Asseily
Chairman and Co-Founder
Street, Apt. No.; or PO Box No. 99 Rhode Island Street, 3rd Floor
City, State, ZIP+4 San Francisco, CA 94103

PS Form 3800, August 2006

7008 3230 0002 3126 2773

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                              ☐ Addressee

B. Received by ( Printed Name)   Date of Delivery
                              MAR 2 2009

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

1. Article Addressed to:

Agent for Service of Process
CT Corporation System
818 Seventh St.
Los Angeles, CA 90017

3. Service Type
☐ Certified Mail      ☐ Express Mail
☐ Registered          ☐ Return Receipt for Merchandise
☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)          ☐ Yes

2. Article Number
(Transfer from service label)        7008 3230 0002 3126 2780

PS Form 3811, February 2004     Domestic Return Receipt     102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                              ☐ Addressee

B. Received by ( Printed Name)   C. Date of Delivery
                                 3/3

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

MAR C 3 2009

1. Article Addressed to:

Alexander Asseily
Chairman and Co-Founder
99 Rhode Island Street, 3rd Floor
San Francisco, CA 94103

3. Service Type
☐ Certified Mail      ☐ Express Mail
☐ Registered          ☐ Return Receipt for Merchandise
☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)          ☐ Yes

2. Article Number
(Transfer from service label)        7008 3230 0002 3126 2773

PS Form 3811, February 2004     Domestic Return Receipt     102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                              ☐ Addressee

B. Received by ( Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

MAR C 3 2009

1. Article Addressed to:

Hosain Rahman
Chief Executive Officer and Co-Founder
99 Rhode Island Street, 3rd Floor
San Francisco, CA 94103

Service Type
☐ Certified Mail      ☐ Express Mail
☐ Registered          ☐ Return Receipt for Merchandise
☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)          ☐ Yes

Exhibit 2

Cingular Wireless and Aliph Introduce the Jawbone® Bluetooth
Headset featuring Noise Shield Technology

*Next-Generation Headset Combines Advanced, Award-Winning
Technology and Industrial Design for Clearer, More Comfortable
Conversations*

**ATLANTA and SAN FRANCISCO- December 21, 2006** - Noise is nothing
with the new Jawbone Bluetooth headset, which is available exclusively
from Cingular Wireless--just in time for the holidays.

Aliph, a leading developer of mobile audio products that deliver
exceptional quality in any environment, and Cingular Wireless, the nation's
largest wireless carrier, today introduced the new Jawbone headset for
Bluetooth mobile phones. Jawbone® is the first available Bluetooth
headset with Noise Shield technology, which virtually eliminates
background noise so calls are clearer. Jawbone's audio performance is
further enhanced by an award-winning design by internationally acclaimed
product designer Yves Behar, which maximizes comfort and functional
simplicity.

Ambient noise is often an issue with many headsets and can make
conversations difficult in noisier environments. The Jawbone Bluetooth
headset with Noise Shield technology uses an advanced, military-grade
noise-canceling system that continuously adapts to users' changing
environments to deliver unparalleled audio quality.

The Noise Shield technology was originally developed by Aliph for DARPA
(The Defense Advanced Research Projects Agency) to enhance
communications in the most hostile and rugged environments. This
technology includes an intelligent system of sensors and software, which
continuously adjusts-at a rate of 500 times per second-to improve audio
quality based on what it knows about the environment. In doing this, the
Jawbone headset will:

Identify and isolate your speech: Jawbone is the only headset that has a
proprietary voice activity sensor. Its ability to determine precisely when you
are speaking is what drives the headset's superior sound quality. Unlike
other headsets, Jawbone can easily separate your speech from other
sounds nearby.

Subtract the unwanted noise: Jawbone's proprietary software continuously
samples the sounds in your environment, and then subtracts those sounds
from your speech signal. This allows you to speak normally in any
environment while still being heard clearly when placing calls.

Automatically enhance your audio: Jawbone constantly adapts, allowing
you to hear your caller better by boosting the frequencies that increase
voice intelligibility to stand out over your environment.

"We endeavored to build the first headset all users will actually want to
wear," said Hosain Rahman, Aliph CEO and co-founder. "We've always
led the industry from a technology perspective, now we've integrated that
adaptive technology into a Bluetooth headset that is simple, intuitive, and
easy to use - the total product experience has been designed around how
consumers actually use wearable technology. As an innovator in wireless
communications, Cingular is the perfect partner to bring the new Jawbone
to market."

"Jawbone is the first Bluetooth headset that adjusts and optimizes both
incoming and outgoing sound so you can conquer the problems of a noisy,
unpredictable world," said David Christopher, Vice President, Product
Management, Cingular Wireless. "Today's consumers may often find
themselves having conversations in less than ideal environments. With
Jawbone, our customers can now make phone calls comfortably in high-
traffic, high noise locations. We are pleased to be the first wireless carrier
worldwide to bring this unique, best-in-class product to market."

Jawbone has a perforated shield that curves to match the outline of the
face, while the soft and smooth underside provides a comfortable feel on
the skin. Only 14 grams, Jawbone feels very light on the head and can be
worn on either ear. Earloops in four different sizes and shapes ensure a
customized fit and feel while also maximizing stability on the ear.

"With Jawbone, we set out to transform a technology product into a
personal accessory," said Yves Behar, who joined Aliph as vice president
and creative director while continuing to lead fuseproject, the San
Francisco-based design studio he founded. "Jawbone's ergonomic and
clean design enhances all aspects of the product experience: visual, tactile

The Jawbone Bluetooth headset was awarded an International CES Innovations Design and Engineering Award and an iF Product Design Award. An earlier generation of the Jawbone headset was honored with the 2005 CES Innovations Award, the BusinessWeek Industrial Design Excellence Award, and a DEMOgod(tm) award from the DEMO industry conference group in 2004. The first version of Jawbone has also been exhibited at both the New York Museum of Modern Art and the San Francisco Museum of Modern Art.

Jawbone is currently available exclusively at select Cingular Wireless retail stores nationwide for $119.99 and is compatible with all Bluetooth-enabled handsets. Consumers can also visit www.jawbone.com.

**About Aliph**
Aliph was founded in 1999 by Alex Asseily and Hosain Rahman, two young engineering entrepreneurs who met as Stanford undergrads. The pair shared a belief that voice would be the dominant interface for mobile devices and that creating a noise-free environment was critical to delivering an improved mobile communications experience. Aliph is committed to ensuring that mobile users have the best possible experience anywhere, anytime. Since 2002, Aliph's technology has been optimized for DARPA to maximize communications clarity in the most hostile conditions. Aliph's first consumer product, the Jawbone headset, debuted in 2004 to critical acclaim for its marriage of performance, design and comfort. Headquartered in San Francisco, Calif., Aliph is funded by private investors and the Mayfield fund. For more information about Jawbone, please go to www.jawbone.com. About Cingular Wireless

Cingular Wireless is the largest wireless carrier in the United States, serving 58.7 million customers. Cingular, a joint venture between AT&T Inc. (NYSE: T) and BellSouth Corporation (NYSE: BLS), has the largest digital voice and data network in the nation -- the ALLOVER™ network -- and the largest mobile-to-mobile community of any national wireless carrier. Cingular is a leader in third generation wireless technology. Its 3G network is the first widely available service in the world to use HSDPA (High Speed Downlink Packet Access) technology. Cingular is the only U.S. wireless carrier to offer Rollover®, the wireless plan that lets customers keep their unused monthly minutes. Details of the company are available at http://www.cingular.com. Get Cingular Wireless press releases emailed to you automatically. Sign up at http://cingular.mediaroom.com.

Sign up for new arrivals and early order advantage

About Us  /  Press  /  Authorized Retailers  /  Corporate Sales  /  Contact Us  /  Careers   © 2009 AliphCom  /  Legal          International

Exhibit 3

WARRANTY

One-year limited warranty

AliphCom ("Aliph") warrants to you, the original retail purchaser ("Consumer"), that this product ("Product") will under normal use operate substantially in accordance with the accompanying documentation for a period of one (1) year from date of original purchase. Consumer's sole and exclusive remedy, and Aliph's sole and exclusive responsibility under this warranty will be, at Aliph's option, either to repair or replace the defective Product during the one (1) year limited warranty period so that it performs substantially in accordance with the accompanying documentation on the date of your initial purchase. Any replacement may be, at the option of Aliph, a new or remanufactured Product. If Aliph, in its sole discretion, determines it is not reasonable to replace the defective Product, Aliph may refund to Consumer the purchase price paid for the Product.

1. The forgoing warranty is limited and is not applicable to: (i) normal wear and tear; (ii) defects or damage caused by misuse, accident (including without limitation collision, fire and the spillage of food or liquid), neglect, abuse, alteration, unusual stress, modification, improper or unauthorized repair, installation, alteration, wiring, or testing, improper storage, use in an unapproved device or if the serial number has been removed; (iii) use not in accordance with the documentation; and (iv) damage caused by the equipment with which the Product is used.

2. To obtain warranty service for any Product that is subject to the foregoing warranty, Consumer must notify Aliph to obtain a Return Material Authorization ("RMA") and return the defective Product together with proof of purchase to the address specified by Aliph in connection with the RMA. Consumer shall bear the cost of shipping the Product to Aliph and Aliph shall bear the cost of shipping the Product back to the Consumer after the completion of service under this limited warranty. Any Product returned to Aliph without an RMA or without proof of purchase will be returned to Consumer at Consumer's cost.

3. The limited warranty extends only to Consumer and is not assignable or transferable to any subsequent purchaser or user.

THE LIMITED WARRANTY SET FORTH ABOVE IS PROVIDED IN LIEU OF ALL OTHER WARRANTIES AND ALIPH HEREBY DISCLAIMS ALL OTHER WARRANTIES OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR USE OR PURPOSE, NON-INFRINGEMENT, QUALITY AND TITLE. ALIPH DOES NOT WARRANT THAT THE PRODUCT IS ERROR FREE OR THAT IT WILL FUNCTION WITHOUT INTERRUPTION. To the extent Aliph may not, as a matter of applicable law, disclaim certain implied warranties, the duration of any such implied warranty shall be limited to the shorter of the one (1) year limited warranty period or the minimum time period permitted under such law. Some states do not allow limitations on the duration of implied warranties, so the above limitation may not apply to you. This limited warranty gives you specific legal rights, and you may also have other rights that vary from state to state.

IN NO EVENT WILL ALIPH BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR
CONSEQUENTIAL DAMAGES OF ANY NATURE WHATSOEVER INCLUDING BUT NOT LIMITED TO LOSS OF
PROFITS OR REVENUES, LOSS OF DATA, LOSS OF USE OF THE PRODUCT OR ANY ASSOCIATED
EQUIPMENT, COST OF ANY REPLACEMENT GOODS OR SUBSTITUTE EQUIPMENT, LOSS OF USE DURING
THE PERIOD THAT THE PRODUCT IS BEING REPAIRED, CLAIMS OF ANY THIRD PARTIES, OR ANY OTHER
DAMAGES ARISING FROM ALIPH'S BREACH OF THIS LIMITED WARRANTY OR THE USE OF THE PRODUCT,
REGARDLESS OF THE FORM OF ACTION WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR
ANY OTHER LEGAL OR EQUITABLE THEORY, EVEN IF ALIPH HAS BEEN ADVISED OF THE POSSIBILITY OF
SUCH DAMAGES. IN NO EVENT WILL ALIPH'S TOTAL CUMULATIVE LIABILITY EXCEED THE PRICE PAID BY
CONSUMER FOR THE PRODUCT. Some states do not allow the exclusion or limitation of incidental or
consequential damages, so the above limitation or exclusion may not apply to you.

If you have any questions concerning this statement of limited warranty please contact Aliph at 1-877-
ALIPHCOM (254-7426 ) or at (408) 848-4348 or email us at info@aliph.com for any more questions.